| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | <u>NOT FOR PUBLICATION</u> |
| ------------------------------------------------------------------x | |
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | |
| ------------------------------------------------------------------x | |
| ASCENT PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | Adv. Pro. No. 22-07029 (SHL) |
| PURDUE PHARMA L.P., P.F. LABORATORIES, INC., PURDUE PHARMACEUTICALS L.P., PURDUE PHARMA TECHNOLOGIES, INC., and RHODES TECHNOLOGIES, | |
| Defendants. | |
| ------------------------------------------------------------------x | |

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S:**

**DAVIS POLK & WARDWELL LLP**
*Counsel for the Defendant, Purdue*
*Pharma L.P., Purdue Pharmaceuticals L.P.,*
*and Rhodes Technologies*
450 Lexington Avenue
New York, New York 10017
   By:   Marshall S. Huebner, Esq.
            Benjamin S. Kaminetzky, Esq.
            James I. McClammy, Esq.
            Kathryn S. Benedict, Esq.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
*Counsel for the IAC Defendants, P.F. Laboratories,*
*Inc. and Purdue Pharma Technologies, Inc.*
One Financial Center
Boston, Massachusetts 02111
By:   John C. Dougherty, Esq.
      Katherine Galle, Esq.

**SEWARD & KISSEL LLP**
*Counsel for Ascent Pharmaceuticals, Inc.*
One Battery Park Plaza
New York, New York 10004
By:   Bruce G. Paulsen, Esq.
      Robert J. Gayda, Esq.
      Catherine V. LoTempio, Esq.
      Paul B. Koepp, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Motion to Dismiss Adversary Proceeding Complaint* [ECF No. 16[2]] (the "Dismissal Motion"), filed by Purdue Pharma L.P. ("PPLP"), Purdue Pharmaceuticals L.P. and Rhodes Technologies. Defendants P.F. Laboratories, Inc. and Purdue Pharma Technologies Inc. (collectively, the "IAC Defendants") filed a joinder to the Dismissal Motion. *See IAC Defendants' Joinder to Debtor-Defendants' Motion to Dismiss Adversary Proceeding* [ECF No. 19] (the "Joinder"). The Dismissal Motion and Joinder seek to dismiss the complaint filed by Ascent Pharmaceuticals, Inc. ("Ascent") for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which is incorporated in Rule 7012 of the Federal Rules of Bankruptcy Procedure. *See Memorandum of Law in Support of Debtor-Defendants' Motion to Dismiss Adversary Proceeding Complaint* [ECF No. 17] ("Debtors Mem. in Support"). For the reasons set forth below, the Court grants Defendants' Dismissal Motion.

---

[2]   Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Adversary Proceeding No. 22-07029.

2

## BACKGROUND[3]

PPLP and its affiliates (collectively, "Purdue") are debtors and debtors in possession in the above-captioned jointly administered proceeding and operate a prescription medication business. As part of this business, Purdue owns or serves as licensees for a variety of patents, including for opioid products. *See* Complaint ¶¶ 27, 34 [ECF No. 1]. Ascent is an opioid manufacturer that focuses on selling generic versions of other companies' pharmaceutical products. *Id.* at ¶¶ 24–26.

In 2010, PPLP obtained approval from the United States Food and Drug Administration ("FDA") for certain oxycodone products that relied on patented technologies ("Purdue Patents") under New Drug Application No. 022272 ("Purdue NDA"). *Id*. at ¶ 23. In 2017, Ascent submitted an Abbreviated New Drug Application No. 211178 (the "Ascent ANDA") to the FDA to obtain approval for its own oxycodone products, which would rely on the Purdue Patents and would be generic versions of the products subject to the Purdue NDA (the "Ascent Products"). *Id*. at ¶ 27. In response to Ascent's submission, Defendants commenced litigation in the United States District Court for the District of Delaware to complain that Ascent infringed on the Purdue Patents by submitting the Ascent ANDA and to seek a determination regarding the validity and enforceability of the Purdue Patents. *Id*. at ¶¶ 28-29. In March 2019, Ascent and Defendants entered into three related and integrated agreements to resolve that pending litigation:

(i)  a Settlement Agreement among Ascent, Hetero FZCO, and Camber Pharmaceuticals, Inc. (collectively, the "Ascent Entities") and Defendants (the "Settlement Agreement");
(ii) a Distribution and Supply Agreement ("DSA") between PPLP and Ascent; and
(iii) a Patent License Agreement between Defendants and Ascent ( the "PLA," and together with the DSA, "Agreements").

---

[3]  For the purposes of this motion to dismiss, the Court takes as true all factual allegations in the Complaint. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009).

*See* Compl. ¶ 7, Ex. A-C.[4]  Entry into these Agreements resolved the pending civil actions and provided terms for the parties' business relationship going forward for, among other things, the manufacture, sale and distribution of Purdue opioid products.  *Id*. at ¶ 30.

The DSA provided Ascent with the option to elect to distribute and sell certain Purdue opioid products in exchange for cost of goods payments and royalties for a period not to extend past December 31, 2022, if certain provisions of the DSA were met.  *Id*. at ¶ 38; *see also* DSA Section 3.1.  Ascent was not required to operate under the DSA; rather, Ascent could affirmatively opt into the DSA by providing a notice to PPLP by October 1, 2020 that Ascent intended to operate under the DSA rather than the PLA.  *Id.* ¶ 39; *see also* DSA Section 2.1.1.  In the event Ascent chose not to operate under the DSA, Ascent would solely operate under the PLA.  DSA Section 2.1.1.  Ascent was required to provide written notice to PPLP by October 1, 2020 of its election to operate under the DSA for the calendar year commencing January 1, 2021.  *Id.*  Ascent was then required to provide notice to PPLP of its election to operate under the DSA for the calendar year commencing January 1, 2022 by October 1, 2021.  *Id.*  If Ascent did not provide notice that it elected to operate under the DSA in 2022, "[the DSA] will terminate on December 31, 2021."  *Id.*

Under the DSA, PPLP would provide to Ascent a certain quantity of inventory that Ascent would sell.  DSA § 3.1.1.  No later than October 1 of each year that Ascent opted to operate under the DSA Ascent was required to provide a notice with certain calculations to determine the amount of Ascent products Ascent would receive to sell.  *Id.*  Ascent was required

---

[4] The Settlement Agreement was annexed as Exhibit A to the Complaint, the DSA was annexed as Exhibit B to the Complaint, and the PLA was annexed as Exhibit C to the Complaint.  Citations to the Agreements will refer to the name of the document, rather than the Exhibit, i.e. DSA Section___.  The Court may consider these Agreements on a motion to dismiss because they are annexed to the Complaint.  *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

4

to pay PPLP a royalty payment equal to ten percent of Ascent's net sales of the product supplied by PPLP, with certain adjustments if enumerated conditions occurred. DSA § 4.1. Each payment was to be accompanied by a royalty certificate that provided certain information about the amount of inventory sold. *Id.* The DSA was solely an agreement between PPLP and Ascent, with no other defendants being signatories to the DSA. *See* Compl. at ¶ 7, fn. 2. Upon non-election or termination of the DSA, the PLA would commence on January 1 of the following calendar year. *See id.* at ¶¶ 50-51.

The PLA granted Ascent a non-exclusive, royalty-bearing, non-transferable license (the "License") under certain Purdue Patents.[5] *See* Compl. ¶ 50. The License allowed Ascent to manufacture, market and sell generic versions of certain Purdue opioid products in exchange for royalties. *Id.* The PLA also allowed Ascent to sell a certain amount of the Ascent Products, which amount would increase over time. *Id.* ¶ 52; *see also* PLA § 2(b). As with the DSA, the PLA required Ascent to pay PPLP a royalty payment equal to ten percent of net sales made under the license, subject to certain adjustments in the event of occurrence of certain conditions. PLA § 3(a). Like the DSA, each payment under the PLA was to be accompanied by a certificate that provided certain information about the Ascent Products sold. *Id.* The License's term and quantity was contingent upon the FDA's approval of the Ascent ANDA by October 1 of the year preceding the License Year; however, at the time of signing of the PLA, the Ascent ANDA had received neither tentative nor final approval from the FDA.[6] PLA at §§ 2, 8. Both the PLA and

---

[5]     If the Ascent ANDA received FDA Approval prior to October 1, 2020, then the License would commence January 1, 2021. If the Ascent ANDA was approved on or after October 1, 2020, but before October 1, 2021, the License would commence on January 1, 2022. If the Ascent ANDA is approved after January 1 but prior to October 1 of any subsequent year, the License would commence on January 1 of the succeeding year after such approval, and if the Ascent ANDA is approved on or after October 1 of any subsequent year, the License would commence on January 1 of the second succeeding year after such approval. PLA § 2(b).

[6]     "License Year" means each calendar year of the License Term. PLA at 4.

5

the DSA contained provisions relating to the termination of the Agreements. DSA § 10.2; PLA § 11.

By letter dated August 6, 2020 (the "2020 Notice"), Ascent notified PPLP that it was electing to proceed under the DSA. Compl. ¶ 58. Ascent and PPLP then proceeded to exchange emails concerning supply agreements, calculations, and pricing. *Id.* ¶¶ 59-65. PPLP provided an invoice to Ascent for the 2021 supply of products on March 19 2021; Ascent paid that invoice on May 14, 2021, prior to the specified due date. *Id.* ¶ 69.

Ascent alleges that it made efforts to obtain a supply of drugs for 2022. Compl. ¶¶ 70-71. On January 7, 2022, Ascent emailed PPLP to inform PPLP that Ascent would like to start the procurement process for the 2022 supply year and to ask for the data needed to perform the supply calculations so that Ascent could issue a purchase order. *Id.* ¶ 71. Ascent also made commitments to its own customers based on the expectation Ascent would receive a supply of inventory in 2022. *Id.* ¶ 70. PPLP initially stated that it would "get back to" Ascent. *Id.* ¶ 72. But on January 14, 2022, PPLP asserted in a letter that it could not fulfill the 2022 supply request and that the DSA had automatically terminated on December 31, 2021 because Ascent had not provided written notice of its intent to operate under the DSA in 2022. *Id.* ¶¶ 72-73. In response, Ascent asserted that it had understood its 2020 Notice in October 2020 to apply to both the 2021 and 2022 years. *Id.* ¶ 75. Ascent also noted that PPLP had also failed to abide by the DSA's timing requirements during 2021. *Id.* Ascent's counsel informed PPLP that it would be willing to accept delivery from PPLP in March or April 2022. *Id.* ¶ 76. Nevertheless, in a letter dated February 3, 2022 (the "February 3rd Letter"), PPLP responded that PPLP would not provide product for 2022 and further asserted that Ascent was also in default under the DSA for

6

failure to make the royalty payments and supply the royalty certificate as was required by Section 4.1 of the DSA. *Id.* ¶¶ 77-78.

The February 3rd Letter also asserted that PPLP had the right to terminate the PLA based on the asserted breach of Article 4 of the DSA and reserved PPLP's right to do so. *Id.* ¶ 80. Ascent made a royalty payment by wire on February 28, 2022; however the royalty certificate was not sent to PPLP until about March 9, 2022 with the delay caused by Ascent's CFO being out of the country attending to a family emergency. *Id.* ¶ 81-82. By letter dated April 6, 2022 PPLP asserted that the royalty certificate was deficient and further asserted that Ascent had materially breached the DSA and that PPLP was electing to terminate the PLA. *Id.* ¶¶ 84, 86.

In September 2019, Purdue filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. *See* Petition, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 16, 2019) [ECF No. 1]. A Confirmation Order was entered on September 17, 2021. *See* ECF No. 3787, Case No. 19-23649.[7]

In June 2022, Ascent filed this action, which asserts claims for: (I) a declaratory judgment that the DSA remains in full force and effect; (II) a declaratory judgment that the PLA remains in full force and effect; (III) breach of contract of the DSA on account of PPLP's failure to supply product to Ascent in 2022, seeking specific performance or, alternatively, damages; and (IV) breach of contract of the PLA on account of Defendants' termination of the same, seeking specific performance or, alternatively, damages.[8] *See* Compl. ¶¶ 88–123. Counts III and

---

[7] In May 2023, the Second Circuit issued a decision affirming the bankruptcy court's approval of Purdue's chapter 11 plan and remanding the case to the district court. *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), *rev'd and remanded sub nom. In Re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023). In August 2023, the Supreme Court of the United States granted the United States Trustee's application for stay and petition for a writ of certiorari. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44, 216 L. Ed. 2d 1300 (2023). The Supreme Court has not ruled on the appeal.

[8] The Complaint was filed under seal in light of the assertion that information in the Complaint is governed by confidentiality provisions in the Agreement. *See* Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(A),

7

IV seek specific performance of the DSA and PLA, or in the alternative, an amount of damages to be determined at trial. *Id.* ¶¶ 106-123.  After Defendants filed the Dismissal Motion, the IAC Defendants filed the Joinder.  In the Dismissal Motion, Defendants assert that the DSA and PLA terminated under the unambiguous language in both agreements or, in the alternative, because of Ascent's breach of certain provisions in the DSA.  Given the procedural posture of the underlying bankruptcy case, Defendants alternately assert that these agreements remain executory contracts that cannot be enforced against the Chapter 11 Debtors here because they have not been assumed.  *See* Debtors Mem. in Support at 2.  Ascent opposes the Dismissal Motion, asserting that the DSA and PLA remain in effect and that Ascent's actions were not objectively unreasonable under the circumstances.  *See* Plaintiff Ascent Pharmaceuticals, Inc.'s Memorandum of Law in Opposition to Motions to Dismiss Adversary Proceeding Complaint [ECF No. 22] ("Opp.").  The Defendants filed replies in further support of the Dismissal Motion. *See Debtor-Defendants' Reply in Further Support of Motion to Dismiss Adversary Proceeding Complaint* [ECF No. 27]; *IAC Defendants' Joinder to Debtor-Defendants' Reply in Further Support of Motion to Dismiss Adversary Proceeding Complaint* [ECF No. 28].

## DISCUSSION

**A. Legal Standards**

1. <u>Motion to Dismiss</u>

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 8(a)(2) requires a

---

107(B), and Fed. R. Bankr. P. 9018 Authorizing Filing of Complaint under Seal [ECF No. 2].  The Defendant also sought to file certain information relation to the Dismissal Motion under seal to protect commercially sensitive information.  *See* Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(A), 107(B), and Fed. R. Bankr. P. 9018 Authorizing Filing of Certain Information Under Seal in Connection with the Defendants' Motion to Dismiss [ECF No. 18].

8

complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (citation and internal quotation marks omitted). The court must then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Id.* at 679 (citation omitted). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (citation and internal quotation marks omitted). Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Courts deciding motions to dismiss must accept all factual allegations as true and draw all inferences in favor of the non-moving party. *See Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 797 (S.D.N.Y. 2008). "However, a court need not accept as true assertions that are contradicted by matters of public record or matters of which a court may take judicial notice. . . ." *LNV Corp. v. Ad Hoc Grp. Of Second Lien Creditors (In re Lapaloma Generating Co., LLC)*, 2020 WL 224569, at *1 (Bankr. D. Del. Jan. 13, 2020). The Court must limit its review to

facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see, e.g.*, FED. R. CIV. P. 10(c). Courts have taken judicial notice of settlement agreements in order to determine whether claims are barred by a previous settlement. *See, e.g.*, *Rolon v. Henneman*, 389 F. Supp. 2d 517, 519 (S.D.N.Y. 2005); *see In re Nortel Networks Inc.*, 545 B.R. 469, 476 (Bankr. D. Del. 2016) ("[O]n a motion to dismiss, a court may consider matters of public record. . . .").

2. Contract Interpretation Under Delaware Law

The Agreements here are governed by Delaware state law. *See* Settlement Agreement § 13; DSA § 11.6; PLA § 15. When interpreting a contract under Delaware law, the Court's primary goal is to ascertain the parties' intent by attempting to fulfill the reasonable shared expectations of the parties at the time they contracted. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Pearl City Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at *9 (Del. Ch. 2021). The Court gives clear and unambiguous language its ordinary and usual meaning. *See Emerald Capital Advisors Corp. v. Karma Auto. LLC (In re FAH Liquidation Corp.)*, 581 B.R. 98, 107 (Bankr. D. Del. 2017) (quoting *Templeton v. EmCare, Inc.*, 868 F. Supp. 2d 333, 339 (D. Del. 2012)). An agreement is considered unambiguous when its "ordinary meaning leaves no room for uncertainty, and the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation." *Pearl City*, 2021 WL 1099230, at *9. "When a contract is unambiguous in its language, the Court will not proceed to interpret it or to search for the parties' intent behind the plain language employed." *Mehiel v. Solo Cup Co.*,

10

2005 Del. Ch. LEXIS 66, at *16 (Del. Ch. May 13, 2005). Parties' disagreement over the meaning of certain agreement provisions does not make the agreement itself ambiguous. *See Pearl City*, 2021 WL 1099230, at *9. "A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id*. (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)); *see VLIW Tech., L.L.C. v. Hewlett-Packard Co*., 840 A.2d 606, 615 (Del. 2003). If such ambiguous provisions exist, "a court cannot choose between two differing reasonable interpretations . . . at the motion to dismiss stage." *Emerald Capital*, 581 B.R. at 107 (internal citation and quotation marks omitted).

## B. Analysis

In support of dismissal, Defendants raise two main arguments. First, they contend that the DSA and PLA terminated, either by their own terms or due to Ascent's breach. Second, they argue that Ascent's claims fail because a non-debtor cannot enforce an executory contract against a Chapter 11 debtor prior to that contract's assumption, and Purdue has not yet assumed the Agreements. *See generally* Debtors Mem. in Support. During oral argument, the Court raised concerns about how and when it should consider the issue of assumption or rejection of the Agreements in the grand scheme of the relief Ascent is seeking. *See* Hr'g Tr. 37:4-39:17, 56:23-58:14 (Dec. 6, 2022) [ECF No. 32]. Ultimately, both parties appeared to agree that the Court should first decide the issue of termination, and that the assumption issue would be effectively moot if the Court find that the two agreements had been terminated. *Id*. at 39:8-17, 57:17-24. Accordingly, the Court turns first to the issue of whether, based on the Complaint and relevant contracts, the PLA and DSA remain in effect. Compl. ¶¶ 88-123.

1. Question of Termination

   a. The DSA

The Court starts with Section 2.1.1 of the DSA. As noted earlier, the DSA and PLA do not operate simultaneously as the PLA commences only upon the termination or expiration of the DSA. *See* Compl. ¶¶ 50-51. The parties disagree whether Section 2.1.1 of the DSA includes one or two deadlines by which Ascent was to provide written notice of its election to operate under the DSA for the calendar years 2021 and 2022. Neither party disputes that Ascent properly met the first deadline of October 1, 2020, by providing written notice in August 2020 ("2020 Notice"), and that, therefore, the DSA became effective for the 2021 calendar year. *Id*. ¶ 58. Where the parties disagree is whether Ascent provided notice to operate under the DSA for the 2022 calendar year. Defendants assert that the plain language of Section 2.1.1 clearly requires a second, separate notice for election to operate in the 2022 calendar year, something that indisputably was not provided by Ascent. *See* Dismissal Motion at 10. By contrast, Ascent contends that its 2020 Notice was sufficient to satisfy not only the notice deadline for 2021 but also met the requirement for the second deadline for calendar year 2022 as Ascent notes that the 2020 Notice was technically provided on or prior to October 1, 2021. *See* Opp. at 23. In essence, Ascent contends that the one written notice sent in October 2020 did double duty for both 2021 and 2022. The Court disagrees.

Ascent's position is doomed by the language of the DSA. Section 10.1 of the DSA addresses termination of the DSA and states that the DSA "will terminate on the Selling Termination Date," which is partially defined as "(i) December 31, 2021, or (ii) December 31, 2022 *if [Ascent] provides the second notice to Purdue* provided for in Section 2.1.1 . . . ." *See* DSA ¶¶ 1.1, 10.1 (emphasis added). Thus, the plain language of the DSA expressly

12

contemplates a second notice to Purdue for the DSA to be in effect for 2022, which means that providing only the 2020 Notice resulted in a termination date for the DSA of December 31, 2021. *Id.* Concluding that one notice was sufficient to elect to operate under the DSA for both 2021 and 2022 would render the second clause in Section 10.1 surplusage and would fail to give that provision any effect. *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Thus, the Court concludes that Ascent's failure to provide this second notice results in the DSA being automatically terminated at the end of calendar year 2021 consistent with the plain language of section 10.1.

This conclusion is bolstered by other provisions of the DSA. Section 2.1.1 of the DSA states, "[i]f no such notice [of the intent to operate under the DSA in 2022] is given, this Agreement will terminate on December 31, 2021." DSA § 2.1.1. Section 2.1.1 goes on to state, "*[i]f* this Agreement has become effective, [Ascent] may provide written notice to Purdue, on or prior to October 1, 2021, of its election to operate under this Agreement rather than the [PLA] for the calendar year commencing on January 1, 2022." *Id.* (emphasis added). This sentence, which begins conditionally, lays out a multi-step process. Ascent must first elect to operate under the DSA at all; if that election is made, the DSA becomes effective for 2021. Then, Ascent *may* elect to operate under the DSA for 2022. The full text of Section 2.21.1 of the DSA clearly contemplates two separate periods, with a recognition that Ascent had no obligation to operate under the DSA in 2022 and could instead allow the DSA to expire and the PLA to become operational. Ascent points to nothing in the text of the DSA that indicates an intention to have one notice suffice to trigger operation of the DSA for both 2021 and 2022. If the parties intended that a single notice would be sufficient to elect participation for both years, the DSA's language would presumably reflect such intention.

Ascent also argues that it did not breach the DSA because Ascent was entitled to flexibility concerning its failure to comply with contractual deadlines in light of the fact that the that Defendants failed to adhere to their own deadlines. Ascent argues that PPLP failed to observe numerous deadlines, such as those set out in Section 3.1.1. of the DSA governing the calculation of the 2021 supply of Ascent Products. Opp. at 22. Ascent argues that this "course of performance" can constitute a waiver or modification. *Id.* But this argument ignores the explicit "no waiver" provision in the DSA, which provides that terms of the contract may be waived but only if the waiver is set forth in a written instrument executed by the party waiving the term. DSA § 11.4. Ascent does not allege that such a waiver exists. It is well settled that "[w]hen the language of a [ ] contract is clear and unequivocal, a party will be bound by its plain meaning. . . ." *Rhone-Poulenc*, 616 A.2d at 1195–96 (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co*, 443 A.2d 925, 926 (Del. 1982)). Here, the clear terms of the contract doom Ascent's argument that the deadlines in the DSA were waived due to the parties' course of conduct.[9]

Even if the DSA did not terminate because Ascent did not elect for 2022, Defendants argue that the DSA terminated because of Ascent's material breaches of the DSA. *See* Debtors Mem. in Support at 25-30. The Defendants identify two material breaches: Ascent's failure to make the required royalty payments, and Ascent's failure to provide the required royalty certificates. *Id.* Under Article IV of the DSA, Ascent was obligated to make royalty payments within thirty days following the end of each Selling Quarter[10] and within thirty days following

---

[9] Notably, Ascent does not argue that the Defendants' failure to adhere to deadlines constituted a breach of contract. Rather, Ascent appears to argue that Defendants' failure to meet certain deadlines somehow waived Ascent's own failure to meet other deadlines or that Defendants are estopped from asserting a contractual breach based on their own failure to meet deadlines. But for the reasons set forth above, the Court disagrees.

[10] Selling Quarters ended on the following dates: March 31, June 30, September 30 and December 31. *See* DSA § 4.1.

14

the Selling Termination Date. DSA § 4.1. To verify the royalty payments outside of the annual "true-up" reconciliation, the royalty payments needed to be accompanied by a royalty certificate. *Id.* But Ascent did not make any royalty payment in 2021. *See* Compl. ¶¶ 81-82 (stating that Ascent made its 2021 royalty payment by wire on February 28, 2022 and provided the royalty certificate on or around March 9, 2022). As a result, PPLP gave notice to Ascent on February 3, 2022, of its material breach of its obligations as to the royalty payments and royalty certificates, and Ascent was given until March 5, 2022, to cure. Compl. ¶¶ 78-79.[11] While Ascent paid the royalty payments on February 28, 2022, it failed to provide the required accompanying royalty certificate until March 9, 2022 because Ascent's CFO was out of the country for personal reasons.[12] *Id.* ¶ 82. While the Court is certainly sympathetic to the family emergency that took Ascent's CFO out of the country and thus delayed Ascent's performance, *see id.*, the plain terms of the DSA make it clear that Ascent only had 30 days to cure the default, which did not occur.

Contrary to Ascent's contention, the Court concludes that the breaches were material, not "slight" or "minor". *See* Opp. at 25-26. Defendants correctly describe the essence of the DSA as "Ascent obtains the right to sell certain Purdue-manufactured opioid products in certain amounts as a non-exclusive distributor, and, in 'consideration' for that, PPLP receives a right to cost of goods payments and royalties in accordance with the terms of the contract." *See* Debtors Mem. in Support at 26. Given the terms of this bargain, Defendants rightly assert that fulfillment of the royalty obligations was "fundamental" to the consideration PPLP received in exchange under the DSA. *Id.* Because Ascent failed to make payments during the entirety of 2021, and then failed

---

[11]    The DSA provides for the ability to cure any breach within 30 days of the notice of default. DSA § 10.2.

[12]    The Complaint does not allege that Ascent made any payments other than the payment made on February 28, 2022.

15

to fully cure the default after receipt of the termination notice, Defendants were within their rights to terminate the DSA.  Accordingly, the DSA was not in effect for 2022.

       b.  The PLA

As explained above, the PLA goes into effect once the DSA terminates.  *See* PLA § 2(b) As the DSA terminated on December 31, 2021, the PLA went into effect the following day on January 1, 2022.  The question is whether that agreement was terminated or remains in effect.

By letter dated April 6, 2022, Purdue informed Ascent that the PLA was terminated based on a breach of Article IV of the DSA.  Compl. ¶ 86.  The PLA provides that the Defendants may terminate the PLA by providing written notice if Ascent, among other things, fails to make any required payments and provide the "true-up" reconciliation required by Article IV of the DSA.  PLA § 11.  As discussed above, Ascent's failure to timely pay to PPLP the royalty payments and provide the royalty certificates were breaches of Article IV of the DSA.  In response, Ascent again argues that these breaches were not material.  *See* Opp. at 28.  But as discussed above, those breaches were material given the significance to the parties' overall bargain.  Such a result is also consistent with other terms of the PLA.  In describing the events under which PPLP could terminate, the PLA only requires a "breach[]" by Ascent.  PLA ¶ 11.  This is in contrast to the requirement that a "material[] breach" by PPLP is required in order for Ascent to enact termination.  PLA ¶ 11.  "It is . . . axiomatic that a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions."  *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2013 WL 3369318, at *5 (Del. Ch. June 19, 2013) (quoting *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969)); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *1 (Del. Ch. Mar. 29, 2011) ("When sophisticated parties in commerce strike a clear bargain, they must live with its terms.").  Accordingly, Purdue

16

was entitled to terminate the PLA for Ascent's failure to comply with its royalty obligations. As Purdue exercised its termination right in April 2022, *see* Compl. ¶ 86, the PLA ceased to be operational, and accordingly, was no longer in full force and effect.

2. Remaining Arguments

Having determined that both the DSA and PLA were terminated, the Court does not need to reach the issue of whether Ascent is improperly attempting to force Purdue to assume the DSA and PLA here. In short, there are no outstanding agreements here that would be subject to assumption or rejection by the Debtors. And having determined that Ascent's breach of the DSA and PLA resulted in the termination of both those agreements, the Court concludes that Ascent is not entitled to any relief under the Complaint.

Finally, given the Court's rulings above, the Court also does not need to address the IAC Defendants' argument that Ascent does not plead any facts specific to the IAC Defendants and that the IAC Defendants have no interest in the instant dispute. *See generally* Joinder (noting that the IAC Defendants assigned all rights under the patents at issue in Ascent's Complaint to PPLP in April 2019). The Court's determination that the Defendants are entitled to dismissal on all counts of the Complaint renders moot the specific arguments of the IAC Defendants.

3. Leave to Replead

Generally, leave to amend should be freely granted when justice so requires unless it would be futile. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *see Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Here, Ascent's claims are entirely premised on the continued validity of the agreements it had with Purdue. But as both the PLA and the DSA were terminated based on the clear and unambiguous language of those contracts, it

would be a futile exercise for Ascent to replead its claims.  *See, e.g., Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016).

## **CONCLUSION**

For the reasons stated above, the Motion to Dismiss is granted.  The Debtor–Defendants should settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon the IAC Defendants and opposing counsel.

Dated: White Plains, New York
       June 14, 2024

                                           */s/ Sean H. Lane*
                                      UNITED STATES BANKRUPTCY JUDGE